Howard v. IOMAXIS, LLC, 2026 NCBC 63.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

KELLY C. HOWARD and FIFTH
THIRD BANK, NATIONAL
ASSOCIATION, AS CO-TRUSTEES
OF THE RONALD E. HOWARD
REVOCABLE TRUST U/A DATED
FEBRUARY 9, 2016, AS AMENDED
AND RESTATED,

Plaintiffs,

v.

IOMAXIS, LLC n/k/a MAXISIQ, INC.;
FIVE INSIGHTS, LLC; BRAD C.
BOOR a/k/a BRAD C. BUHR; JOHN
SPADE, JR.; WILLIAM P. GRIFFIN,
III; NICHOLAS HURYSH, JR.; and
ROBERT A. BURLESON,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18CVS011679-590

**ORDER AND OPINION ON
PLAINTIFFS' MOTION TO DISMISS
COUNTERCLAIM**

1.      **THIS MATTER** is before the Court following the 25 March 2026 filing of

*Plaintiffs' Motion to Dismiss Counterclaim* (the Motion).  (ECF No. 901 [Mot.].)

2.      For the reasons set forth herein, the Court **GRANTS** the Motion.

*Johnston, Allison & Hord, P.A., by Lauren Suber, Greg C. Ahlum, David
T. Lewis, Patrick E. Kelly, Katie D. Burchette, Alexandra Nibert, and
Austin R. Walsh, for Plaintiff Kelly C. Howard, as Co-Trustee of the
Ronald E. Howard Revocable Trust u/a Dated February 9, 2016, as
Amended and Restated.*

*Womble Bond Dickinson (US) LLP, by Scott D. Anderson and Miriam
Colón, for Plaintiff Fifth Third Bank, National Association, as Co-
Trustee of the Ronald E. Howard Revocable Trust u/a Dated February
9, 2016, as Amended and Restated.*

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by David Allen,
Benjamin S. Chesson, and Anna Majestro, and Nelson Mullins Riley &*

*Scarborough LLP, by Travis Bustamente, for Defendants IOMAXIS, LLC n/k/a MAXISIQ, Inc.; Five Insights, LLC; Brad C. Boor a/k/a Brad C. Buhr; John Spade, Jr.; William P. Griffin, III; and Robert A. Burleson.*

*Miller Monroe Holton & Plyler, PLLC, by Paul Flick, Jason A. Miller, and Robert Rader, and Whiteford, Taylor & Preston, L.L.P., by Steven Tiller, for Defendant Nicholas Hurysh, Jr.*

Robinson, Chief Judge.

## I.  INTRODUCTION

3.  This action arises out of decedent Ronald E. Howard's (Howard) purported interest in IOMAXIS, LLC n/k/a MAXISIQ, Inc. (IOMAXIS) and the efforts of Plaintiffs Kelly C. Howard (K.C.) and Fifth Third Bank, National Association (Fifth Third; and with K.C., Plaintiffs), as Co-Trustees of the Ronald E. Howard Revocable Trust u/a dated February 9, 2016, as Amended and Restated (the Trust), to recover the value of that interest.  Defendants IOMAXIS, Brad C. Boor a/k/a Brad C. Buhr (Buhr), William P. Griffin, III (Griffin), John Spade, Jr. (Spade), and Robert A. Burleson (Burleson; and with IOMAXIS, Buhr, Griffin, and Spade, Counterclaimants), contend that Buhr properly exercised his option to purchase Howard's interest shortly after Howard's death.

## II.  FACTUAL BACKGROUND

4.  The Court does not make findings of fact on a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure (the Rule(s)).  *Trail Creek Invs. LLC v. Warren Oil Holding Co.*, 2023 NCBC LEXIS 70, at *2 (N.C. Super. Ct. May 9, 2023).  Instead, the Court draws its factual summary from the allegations in the counterclaim, the counterclaim's exhibits, and the documents to which the

counterclaim specifically refers. *See Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 51, at *2 (N.C. Super. Ct. June 9, 2017); *James H.Q. Davis Tr. v. JHD Props.*, 2022 NCBC LEXIS 153, at *1 (N.C. Super. Ct. Dec. 9, 2022).

### A. The Parties

5. IOMAXIS is a corporation chartered under Delaware law. (Answer Suppl. & 2d Am. Compl. & Countercl., Countercl. ¶ 1, ECF No. 896 [Countercl.].) IOMAXIS provides technical and engineering services to customers within the United States government and in the private sector. (Countercl. ¶ 1.)

6. Five Insights, LLC (Five Insights) is a limited liability company organized under Delaware law. (Countercl. ¶ 2.) Five Insights is IOMAXIS's sole shareholder. (Countercl. ¶ 2.)

7. Buhr, Spade, Griffin, and Burleson are members of Five Insights and former members of IOMAXIS. (Countercl. ¶¶ 2–3.)

8. K.C. and Fifth Third are co-trustees of the Trust. (Countercl. ¶ 4.) K.C. is Howard's son and the executor of Howard's estate (the Estate). (Countercl. ¶ 4.)

### B. Creation and Restructuring of IOMAXIS

9. John Mills founded IOMAXIS under North Carolina law, intending to use the company as a real estate investment holding vehicle.[1] (*See* Countercl. ¶ 5.) In the early 2000s, Howard, Buhr, and others became members of IOMAXIS after Buhr

---

[1] IOMAXIS's original name was IOMAX Information Services, LLC. (*See* Countercl. ¶ 5.) In January 2014, IOMAX Information Services, LLC changed its name to IOMAXIS, LLC. (Countercl. ¶ 7.) Even later, IOMAXIS, LLC became MAXISIQ, Inc. (*See generally* Countercl.)

decided to use the company to deliver technology and security solutions. (Countercl. ¶ 6.) Buhr was responsible for the company's daily operations. (Countercl. ¶ 8.)

10. In 2013, IOMAXIS retained attorneys Jennifer Huber (Huber) and Stephanie Olson (Olson) from Fluet Huber & Hoang, PLLC (FHH) to assist with its restructuring. (*See* Countercl. ¶¶ 30–31, 44, 103.) The planned restructuring was intended to involve: (1) changing IOMAXIS's domicile from North Carolina to Texas; and (2) adopting a new operating agreement. (Countercl. ¶¶ 32–33, 38, 50.) At the time, IOMAXIS was governed by a North Carolina Operating Agreement. (*See* Countercl. ¶¶ 5, 89, 169.)

11. In June 2015, Buhr, acting as IOMAXIS's manager, adopted a new operating agreement (the Texas OA) for IOMAXIS. (Countercl. ¶ 35; Compl. Ex. I, ECF No. 3 [Texas OA].) That same month, Olson filed the conversion documents that domesticated IOMAXIS as a Texas entity. (Countercl. ¶ 39.)

12. On 18 December 2015, Olson emailed IOMAXIS's members a document by which they could ratify "recent administrative actions." (*See* Countercl. ¶¶ 43, 45, 115.) The next day, Howard signed the document and purportedly ratified (a) that the company's original business objective—investing in real estate—had been abandoned shortly after its formation; (b) that, effective as of 15 June 2015[2], IOMAXIS had changed its domicile from North Carolina to Texas; and (c) the

---

[2] The Court notes that Counterclaimants allege Howard ratified certain company actions as of 19 June 2015. (Countercl. ¶ 50.) However, the document states that it "ratif[ies] and confirm[s] the action described in the foregoing resolutions, as of June 15, 2015." (Countercl. ¶ 151.)

adoption of the Texas OA.  (Countercl. ¶¶ 47–48, 50–52, 121–25, 151.)  On 7 January 2016, Howard returned the ratification document bearing his signature (the signature page) to Olson via email.  (Countercl. ¶¶ 53, 135.)

13.    From June 2015 until Howard's death on 12 June 2017, IOMAXIS operated under the Texas OA and Texas law.  (Countercl. ¶¶ 50, 55–56.)

**C.    The Texas OA**

14.    Section 8.2 of the Texas OA defines the rights of a member's successor or legal representative upon the member's death:

> Immediately upon the occurrence of an involuntary withdrawal of a Member, whether due to death, disability or a finding of Cause, the successor or legal representative of such Member shall not become a Member, but shall become an Interest Holder entitled to such rights (economic and otherwise) provided under the Act[3] to the assignee of an interest in a limited liability company, except that such successor shall not be entitled to receive in liquidation of the Interest, pursuant to the Act, the fair market value of the Member's Interest as of the date of the Member's Involuntary Withdrawal from the Company.

(Texas OA § 8.2.)

15.    Section 7.1 limits, in relevant part, the rights of Interest Holders as follows:

> Except as specifically provided in this Agreement, no Interest Holder at any time shall, voluntarily or involuntarily, transfer, assign, pledge or otherwise encumber any of its Interest to any Person.
>
> . . . .
>
> [N]o Interest Holder shall Transfer all or any portion of the Holder's Interest, or any rights with respect to such Interest, unless the conditions set forth below are satisfied:
>
> a. At least seventy five percent (75%) of the Members, excluding the transferring Member, approve the proposed Transfer; [and]

---

[3] The Act refers to the Texas Limited Liability Company Act.  (Texas OA Ex. B.)

b. The Manager[4], upon such terms and conditions as the Manager shall determine in his sole but reasonable discretion, expressly approves the Transfer and the transferee[.]

(Texas OA § 7.1.)

16. Under Section 7.4, "[a]ny Transfer of an Interest that does not fully comply with all applicable provisions of this Agreement shall be null and void and without effect, ab initio." (Texas OA § 7.4.)

17. Sections 8.3.1 and 8.3.2 of the Texas OA provide for the disposition of a member's interest upon their death:

*Disposition of Interest Upon Death.* Upon the death of a Member (an "**Involuntary Transfer Event**"), the Company shall have, for a period of sixty (60) days after receiving notice of such Involuntary Transfer Event (unless this period is extended by agreement), the option (but not the obligation) to purchase at fair market value, all of the Membership Interest of the Company that such Member owned at the time of the Member's death. The Company may secure life insurance for purposes of implementing this Section 8.3.

If the Company does not exercise its option to purchase all of the Membership Interest of such Member in accordance with Section 8.3.1, the remaining Class A Member(s) shall have, for a period of sixty (60) days following expiration of the option period in 8.3.1, the option (but not the obligation) to purchase at fair market value (in the same proportion as the Membership Interest held by the Member exercising this option), all of the Membership Interests that such Member owned at the time of such Involuntary Transfer Event.

(Texas OA §§ 8.3.1–.2.)

18. Section 8.3.3 further provides that

[b]y executing this Agreement, the Members irrevocably bind their estate, guardian and/or successor(s) in interest to sell to the remaining Member(s) and/or the Company, as applicable, the entire Membership Interest of the Company that such Member owned at the time of his death upon written notification to such Member's estate, guardian

---

[4] The Texas OA provides that Buhr is the Manager. (Texas OA, at 4–5, 37.)

and/or successor(s), as applicable, that the Company or the remaining Member(s) has exercised their option pursuant to 8.3.1. or 8.3.2. above. The amount required to be paid to the departing Member/estate of the deceased Member, as applicable, shall be paid pursuant to a promissory note ("**Company Note**"), in sixty (60) equal monthly installments with the first payment to be made within sixty (60) days of the date of death of the deceased Member or at such time as an executor or administrator is appointed for his estate, whichever is later (the "**Settlement Date**"); but, in no event shall the Settlement Date be later than one hundred (120) days from the date of death of the deceased Member.

(Texas OA § 8.3.3.)

19.     Section 13.15 provides that "[t]he laws of the State of Texas shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the Members[.]"  (Texas OA § 13.15.)

**D.     Transfer of Howard's Interest**

20.     Howard's interest in IOMAXIS allegedly passed to the Estate.  (*See* Countercl. ¶ 75; Texas OA § 8.2.)   K.C. has represented that the Estate opened, following Howard's death, on 25 July 2017.  (Countercl. ¶ 59.)   K.C. became the executor of the Estate on the same date.  (Pls.' Reply Supp. Mot. Ex. 1, ECF No. 914.1 [Letters Testamentary].)[5]

21.     On 29 August 2017, the following notice (the August Notice) was sent to the Estate:

On behalf of our client, IOMAXIS, this Letter is provided to the Estate as the notice of intent for the Company and Brad Buhr, a member and

---

[5] The Court takes judicial notice of the Letters Testamentary issued to K.C.  *See Southland Nat'l Ins. Corp. in Liquidation v. Lindberg*, 924 S.E.2d 577, 586 (N.C. Ct. App. 2025) ("This Court may take judicial notice of 'the public records of other courts within the state judicial system[.]'" (citation omitted)); *Zloop, Inc. v. Parker Poe Adams & Bernstein, LLP*, 2018 NCBC LEXIS 16, at *14–15 (N.C. Super. Ct. Feb. 16, 2018) (noting that "courts may take judicial notice on a 12(b)(6) motion without converting the proceeding to one for summary judgment" (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007))).

the sole manager of the Company (the "Manager"), to ensure the proper transition of ownership interest and the valuation of that interest due to the excruciatingly painful loss of Mr. Ronald Howard.

All voting rights with respect to the Interest have been transferred to the Manager, effective as of June 12, 2017. Membership interests of the Company are non-transferrable. The Company's intent to offer Mr. Kelly Howard the right to acquire a membership interest in the Company will be accomplished outside the scope of settlement of the Estate in a separate, written agreement.

The buy-sell agreement (the "Agreement") with Mr. Buhr will be formalized. The value of Mr. Howard's Interest is to-be-determined as of June 12, 2017.

The Agreement will contain terms and conditions that are customary for transactions of this type.

(Br. Supp. Ex. A, ECF No. 903.1 [Aug. Notice]; Countercl. ¶¶ 66, 196.)

22. On 20 September 2017, IOMAXIS and Buhr sent another notice to the Estate (the September Notice):

Pursuant to that certain Operating Agreement (a copy of which is available upon request of the recipient hereunder, the "Agreement") of IOMAXIS, LLC, a Texas limited liability company (the "Company"), including without limitation Sections 7.1, 8.2 and 8.3.1, the Company hereby provides written notice of the Company's decision to exercise its option to purchase the Interest formerly held by Ronald Howard for an amount equal to $1,020,000.00, representing the present fair market value of such Interest, as determined by the Manager and as reflected in the purchase of Interests by Members contemporaneously herewith. The decision to exercise the Company's rights hereunder has been approved by the Members. All capitalized terms included in this notice are subject to the corresponding definition set forth in the Agreement.

Nothing herein shall be construed as a waiver of any and all rights the Company or its principals may have, which rights are hereby reserved.

(Br. Supp. Ex. B, ECF No. 903.2 [Sep. Notice]; Countercl. ¶¶ 67, 197.)

23.     On 26 October 2017, K.C.'s counsel represented to IOMAXIS that "[t]he only signed documents we have are the North Carolina Operating Agreement . . . and an Amendment to that Operating Agreement." (Countercl. ¶ 89.)

24.     On 8 December 2017, K.C., acting as executor of the Estate and as co-trustee of the Trust, purported to transfer the Estate's interest in IOMAXIS to the Trust. (Countercl. ¶ 75.) Neither K.C., nor any other representative for the Estate or the Trust, sought or obtained approval from IOMAXIS's members for this transfer. (Countercl. ¶¶ 75–77.)

### E.     Litigation and Discovery Issues

25.     On 18 June 2018, Plaintiffs initiated this action with the filing of the *Complaint*. (ECF No. 3 [Compl.].) In the *Complaint*, Plaintiffs asserted that Howard did not approve IOMAXIS's conversion to a Texas entity or the adoption of the Texas OA. (Countercl. ¶¶ 93–94.)

26.     After Plaintiffs filed suit, Burleson emailed Huber, requesting that FHH provide "anything that would help" defend against the *Complaint*, including IOMAXIS's "latest Operating Agreement, Conversion Filings, etc." and "[a]ny confirmation from members approving or notes commenting on these documents." (Countercl. ¶¶ 103, 105.) Huber expressed hesitations about FHH's involvement in the litigation, stating that, "due to FHH's long-standing representation of [IOMAX USA][6], we believe that any direct involvement of FHH in this matter presents a

---

[6] IOMAX USA is separate entity from IOMAXIS and was previously owned by Howard. (*See* Countercl. ¶ 22.)

conflict of interest for the firm." (Countercl. ¶ 106.) FHH ultimately agreed to produce documents, but the documents it produced did not include Howard's email to Olson or his signature page. (*See* Countercl. ¶ 108.)[7]

27. In 2019, IOMAXIS requested that the Trust produce "[a]ll documents in Ronald Howard's possession at the time of his death relating to IOMAXIS." (Countercl. ¶ 139.) The Trust did not produce Howard's email to Olson or his signature page at the time. (*See* Countercl. ¶¶ 135, 139.)

28. At some point during the discovery process, the parties produced the ratification document without Howard's signature. (Countercl. ¶ 126.) During the discovery phase of this litigation, IOMAXIS asserted that Howard had signed the ratification document, while K.C. denied that he had done so. (Countercl. ¶ 126.)

29. On 3 January 2022, Plaintiffs filed the *First Amended Complaint*, alleging once more that Howard did not approve IOMAXIS's conversion to a Texas entity or the adoption of the Texas OA. (Countercl. ¶ 93.)

30. On 29 August 2023, the Court entered an order requiring "the Trust to confirm by affidavit its search for, and production of . . . documents in Mr. Howard's office at IOMAX USA" responsive to IOMAXIS and other Defendants' request for all "IOMAXIS documents signed by Ron[ald] Howard from 1 January 2015 to 12 June 2017." (Order Following Conference ¶ 3b, ECF No. 354; *see also* Countercl. ¶¶ 99,

---

[7] Despite Huber's representations about a conflict of interest, she advised K.C. on his claims against IOMAXIS using her IOMAX USA email address. (Countercl. ¶¶ 109, 111–13.) Olson did the same through her personal Google Mail account. (Countercl. ¶¶ 109–110, 113, 157–58.)

140.) In response to the Court's order, K.C. signed an affidavit representing that he was "not aware of any documents signed by [Howard] between January 1, 2015 and June 12, 2017 which related to IOMAXIS, LLC." (Countercl. ¶ 101.)

31. On 8 December 2023, Plaintiffs filed the *Supplemental and Second Amended Complaint* (the *Second Amended Complaint*). (ECF No. 401 [2d Am. Compl.].) In the *Second Amended Complaint*, Plaintiffs asserted, once more, that Howard did not approve IOMAXIS's conversion to a Texas entity or the adoption of the Texas OA. (2d Am. Compl. ¶¶ 7(b), 61–64; Countercl. ¶¶ 93–94.)

32. In 2023 and in response to a subpoena for her personal records, Olson produced a copy of a page bearing Howard's signature. (Countercl. ¶ 114.) Counterclaimants allege the signature page appears to correspond with the ratification document that Olson sent to IOMAXIS's members in December 2015. (Countercl. ¶ 115.) After Olson produced the signature page, K.C. denied that the document was authentic and contended that IOMAXIS could not prove the signature belonged to Howard. (Countercl. ¶ 129.)

33. In 2024, IOMAXIS served additional discovery requests on the Trust. (Countercl. ¶ 130.) Late that year, K.C. disclosed that he was in possession, custody, or control of the 7 January 2016 email in which Howard sent his signature page to Olson, and he produced the email. (*See* Countercl. ¶¶ 135–36, 153–54.) However, K.C. asserted that Howard's email was not responsive to any discovery requests and that he disclosed it "in the interest of transparency." (Countercl. ¶ 138.) K.C. also asserted that the signature page did not correspond with the December 2015 email

Olson sent to Howard. (Countercl. ¶ 143.) IOMAXIS later learned that K.C. and his representatives had possessed Howard's signature page since at least 20 July 2017. (Countercl. ¶¶ 146–49, 153.)

34. K.C. also produced a memorandum from Huber to Clint Hubbard—an advisor to Howard and representative of the Trust—in which Huber stated, "Although Mr. Spade may attempt to challenge the enforceability of the OA, the other Members do not." (Countercl. ¶¶ 24, 147, 161.) The memorandum was dated 15 March 2016, and the Texas OA was attached to it. (Countercl. ¶¶ 161–62.)

### III.   PROCEDURAL BACKGROUND

35. On 18 June 2018, Plaintiffs initiated this action with the filing of the *Complaint*. (ECF No. 3.) On 3 January 2022, Plaintiffs filed the *First Amended Complaint*. On 8 December 2023, Plaintiffs filed the *Second Amended Complaint*.

36. On 12 February 2026, IOMAXIS, Buhr, Griffin, Spade, Five Insights, and Burleson filed a consolidated answer to the *Second Amended Complaint*. (Answer Suppl. & 2d Am. Compl. & Countercl., ECF No. 896.) In addition, IOMAXIS, Buhr, Griffin, Spade, and Burleson filed a counterclaim (the Counterclaim) asserting (i) a fraud claim against K.C. for representing that Howard never approved or signed a document approving the Texas conversion or Texas OA, (Countercl. ¶¶ 173–185); and (ii) a purported specific performance claim against the Trust.[8] (Countercl. ¶¶ 186–201).

---

[8] Counterclaimants assert their specific performance "claim" in the alternative and reserve their contention that the Trust is not a proper party to the action. (Countercl. ¶ 187.) Through this claim, Counterclaimants assert they are entitled to an order compelling the

37.     On 25 March 2026, Plaintiffs filed the Motion and a supporting brief. (Mot.; Pls.' Br. Supp. Mot. Dismiss, ECF No. 902 [Br. Supp.].)  On 20 April 2026, Counterclaimants filed their brief opposing the Motion. (Countercl. Pls.' Br. Opp'n Mot., ECF No. 909 [Br. Opp'n].)  On 7 May 2026, Plaintiffs filed their reply. (Pls.' Reply Supp. Mot., ECF No. 913 [Reply].)

38.     On 1 July 2026, a hearing was held on the Motion.  Present were counsel for all parties except for Nicholas Hurysh, Jr., who chose not to attend with the Court's permission.

39.     The Motion is ripe for resolution.

## IV.     LEGAL STANDARD

40.     In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations in the counterclaim in the light most favorable to the counterclaimants.  *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017).  The Court's inquiry is "whether, as a matter of law, the allegations of the [counterclaim] . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]"  *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670 (1987) (citation omitted).  The Court accepts all well-pleaded factual allegations in the relevant pleadings as true.  *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The Court is, therefore, not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Good Hope*

---

Trust to sell to IOMAXIS Howard's interest in IOMAXIS, per the option provisions in the Texas OA.

*Hosp., Inc. v. N.C. Dep't of Health & Hum. Servs.*, 174 N.C. App. 266, 274 (2005) (citation modified).

41.     Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the [counterclaim]." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (citation omitted). The Court may consider these documents without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id.*

42.     Our Supreme Court has observed that "it is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the counterclaim on its face reveals that no law supports the claim; (2) the counterclaim on its face reveals the absence of facts sufficient to make a good claim; or (3) the counterclaim discloses some fact that necessarily defeats the counterclaim.'" *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation modified). This standard of review for Rule 12(b)(6) motions is the standard our Supreme Court "routinely uses . . . in assessing the sufficiency of [counterclaims] in the context of complex commercial litigation." *Id.* at 615 n.7 (citations omitted).

## V.     ANALYSIS

### A.     Fraud Claim

43.     "The essential elements of fraud are a '(1) [f]alse representation or concealment of a [past or existing] material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage

to the injured party.' " *Henson v. Green Tree Servicing LLC*, 197 N.C. App. 185, 191 (2009) (citation omitted).

44. To establish deception in fact, a claimant must show that it was actually deceived by the opposing party's misrepresentations or omissions and, as a result, it "acted or refrained from acting in a certain manner[.]" *See Brown v. Secor*, 2020 NCBC LEXIS 134, at \*14 (N.C. Super. Ct. Nov. 13, 2020) (quoting *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 663 (1995)); *see also River v. Hodges*, 255 N.C. App. 82, 89 (2017). The claimant must also show that its reliance was justified or reasonable. *See Brown*, 2020 NCBC LEXIS 134, at \*14. "To establish justifiable reliance, a claimant must sufficiently allege that it made a reasonable inquiry into the misrepresentation and . . . that it was denied the opportunity to investigate or that it could not have learned the true facts by exercise of reasonable diligence." *Tiller v. Phillips*, 2025 NCBC LEXIS 141, at \*45 (N.C. Super. Ct. Oct. 15, 2025) (citation modified) (quoting *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 454 (2015)).

45. "Whether reliance is reasonable is dependent upon the circumstances," *Bucci v. Burns*, 2020 NCBC LEXIS 79, at \*18 (N.C. Super. Ct. June 30, 2020) (citation modified), and "is a question for the jury[] unless the facts are so clear that they support only one conclusion." *L'Heureux Enters. v. Port City Java, Inc.*, 2009 NCBC LEXIS 26, at \*12 (N.C. Super. Ct. Sep. 4, 2009) (citing *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214 (1999)); *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 27 (2003) (claimant's unfulfilled request for copy of agreement,

"absent more," was insufficient to show reasonable investigation into his rights under agreement as a matter of law). "When the circumstances are such that a [claimant] seeking relief from alleged fraud must have known the truth, the doctrine of reasonable reliance will prevent him from recovering[.]" *Johnson v. Owens*, 263 N.C. 754, 758 (1965); *L'Heureux Enters.*, 2009 NCBC LEXIS 26, at *13 (claimants who signed agreement were charged with knowledge of its contents and could not have reasonably relied on misrepresentation of its terms).

46. Finally, "the circumstances constituting fraud . . . shall be stated with particularity." N.C.G.S. § 1A-1, Rule 9(b). "[T]he particularity requirement is met by alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Value Health Sols., Inc. v. Pharm. Rsch. Assocs.*, 385 N.C. 250, 263 (2023).

47. Plaintiffs contend that Counterclaimants have not alleged actual or reasonable reliance on K.C.'s purported misrepresentations. (Br. Supp. 9–14.) Specifically, Plaintiffs argue that Counterclaimants have not alleged that they detrimentally changed their position based on the belief that Howard never approved the Texas conversion or Texas OA. (Br. Supp. 10–11.) Plaintiffs also argue that Counterclaimants have not alleged they were prevented from investigating the alleged ratification, and that Counterclaimants' allegations show their investigation into the matter was inadequate. (Br. Supp. 12–14.) In support of this argument, Plaintiffs assert that Counterclaimants could have discovered—but failed to

reasonably investigate—Howard's signature page because it was (or should have been) a part of IOMAXIS's corporate records and was in the possession, custody, or control of its legal agent, Olson. (Br. Supp. 12.) Plaintiffs acknowledge Counterclaimants' allegation that Burleson sent an email to Huber requesting " 'anything that would help' with the instant litigation," but argue this request is insufficient to show a reasonably diligent investigation. (Br. Supp. 12–13.)

48. Counterclaimants respond that they actually relied on K.C.'s misrepresentations because the parties "would have completed the buy-sell process long ago and without the protracted litigation if [Plaintiffs] had not hidden Howard's signature pages." (Br. Opp'n 13; Countercl. ¶¶ 171, 184.) Counterclaimants also argue that Plaintiffs prevented them from investigating Howard's alleged ratification by "with[olding] responsive documents and fil[ing] a false affidavit." (Br. Opp'n 11; see Countercl. ¶¶ 99–102.) Further, Counterclaimants argue that they reasonably investigated K.C.'s alleged misrepresentations by requesting documents from the "two entities [that] possessed Howard's signature page and email to Olson confirming his signature: K.C. and FHH." (Br. Opp'n 9–10.) Counterclaimants point to the email Burleson sent to Huber, the discovery requests they served on the Trust, and the Court orders they obtained concerning the Trust's productions. (Br. Opp'n 9; Countercl. ¶¶ 96, 99, 105, 130–35.)

49. Counterclaimants also reject Plaintiffs' suggestion that "[IOMAXIS] had constructive possession of Howard's signature page and email" via Olson, as Counterclaimants have not alleged that she was IOMAXIS's agent at the time

Plaintiffs filed suit. (Br. Opp'n 11.) Moreover, Counterclaimants argue that the reasonableness of their reliance is an issue of fact for a jury to resolve. (Br. Opp'n 8–9.) Counterclaimants finally contend that dismissal of their fraud claim would set a dangerous precedent that opposing parties cannot rely on one another to produce documents in litigation, (Br. Opp'n 14–15), and that there would be no repercussions for parties who misrepresent the existence of discoverable documents.

50.    In reply, Plaintiffs argue that Counterclaimants "do not and cannot" allege actual reliance on K.C.'s alleged misrepresentations, as Counterclaimants "acted at all times as if they disbelieved the allegedly fraudulent statements described in the Counterclaims." (Reply 6.) Plaintiffs also take issue with Counterclaimants' allegation that the parties would have completed the buy-sell process if Plaintiffs had produced the signature page earlier, as this allegation assumes the Trust would have assented to the transaction.[9] (Reply 6–7.) Plaintiffs further argue that it is not reasonable for Counterclaimants to rely on K.C., an outsider to IOMAXIS, "to affirm approvals for documents under which IOMAXIS ha[d] allegedly operated for years and which Counterclaimants had already advanced as controlling." (Reply 8.)[10]

---

[9] The Court does not discuss the merits of the purported specific performance claim. However, with respect to that claim, the Court notes that Plaintiffs contend the option was not properly exercised—assuming the Texas OA controls—such that the Trust has no obligation to comply with the buy-sell process. (*See* Reply 2–7.)

[10] The parties also dispute whether Counterclaimants can assert a fraud claim against K.C. in his individual capacity, as K.C. is only a party to the action in his capacity as trustee. (Br. Supp. 15–16; Br. Opp'n 15–16.) The Court does not address these arguments in full because it has determined that the fraud claim fails for other reasons. *See infra* ¶ 51. However, the Court notes that Counterclaimants have not cited, nor has the Court located, any North Carolina authorities suggesting that a counterclaim may be asserted against a person in a capacity different from that in which they sued. (*See* Br. Supp. 15–16; Br. Opp'n 15–16); *see*

51. The Court agrees with Plaintiffs that Counterclaimants' fraud claim fails. The Counterclaim alleges that IOMAXIS operated under the Texas OA and Texas law "[f]rom 2015 until Howard's death" after Howard ratified IOMAXIS's governance changes. (Countercl. ¶¶ 53–55.) The Counterclaim also alleges that Buhr attempted to purchase Howard's interest pursuant to the option provisions of the Texas OA. (Countercl. ¶¶ 65–67, 196–97.) These allegations suggest that Counterclaimants "must have known the truth" that Howard ratified IOMAXIS's conversion to a Texas entity and the adoption of the Texas OA. *See Johnson*, 263 N.C. at 758; (*see also* Br. Opp'n 13 ("[IOMAXIS] relied on Howard's general approval of the governance changes—which he repeatedly affirmed.")).

52. Further, the Counterclaim alleges that even after the *Complaint* was filed, "[IOMAXIS] claimed that Howard had signed [the ratification document]." (*See* Countercl. ¶ 126.) This allegation shows that Counterclaimants were not actually deceived by K.C.'s representation that Howard never approved or signed a document approving IOMAXIS's governance changes. *Cf. Garner v. Smith*, 2009 N.C. App. LEXIS 403, at *6–7 (N.C. Ct. App. Apr. 21, 2009) (fraud claim failed where plaintiff alleged reliance on representation that third party offered to buy his home, but also alleged he knew the third party did not sign the contract in which the purported offer was made); *Keyzer v. AmeriLink, Ltd.*, 2005 N.C. App. LEXIS 1729, at *9–12 (N.C. Ct. App. Aug. 16, 2005) (finding no reliance on defendants' alleged misrepresentations

---

*also Davis v. Singleton*, 259 N.C. 148, 153 (1963) ("This action calls into account defendant's . . . official acts as executrix. This cannot be done in an action to which the executrix is not a party and making the *individual* who also happens to be the personal representative a party will not suffice."); *State ex. rel. Pilard v. Berninger*, 154 N.C. App. 45, 52 (2002).

where record showed plaintiff "did not trust defendants"); *Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 31–32 (2003) (same); *Rider v. Hodges*, 255 N.C. App. 82, 89 (2017) (plaintiff was not "actually deceived" by document because he "recognized it was false upon receiving it").

53.     In addition, it appears to the Court that IOMAXIS would be charged with knowledge of Howard's signature page and ratification of the Texas conversion and Texas OA.  Counterclaimants allege IOMAXIS retained Olson to help it change its state of domicile and adopt a new operating agreement, and she obtained Howard's signature page pursuant to completing those tasks.  (*See* Countercl. ¶¶ 30–31, 43–53); *Sparks v. Union Tr. Co.*, 256 N.C. 478, 482 (1962) ("[T]he general rule [is] that knowledge of the agent is imputed to the principal[.]"); *Zloop, Inc.*, 2018 NCBC LEXIS 16, at *17–18 ("[A] principal is generally bound by the knowledge and acts of its agent when the agent clearly acts within the scope of his authority to conduct the principal's business.").  That Olson may have no longer been IOMAXIS's agent at the time Plaintiffs filed suit is unconvincing.  *See Com. Bank of Danville v. Burgwyn*, 110 N.C. 267, 273–74 (1892) ("The foundation principle upon which rests the doctrine that a party, whether an individual or a corporation, is chargeable with notice imparted to his agents in the line of their duty, is that agents are presumed to communicate all such information to their principals because it is their duty so to do."); *United States v. Ridglea State Bank*, 357 F.2d 495, 498 (5th Cir. 1966) ("[A]n agent's knowledge, if otherwise properly imputable to his principal, will continue to be imputed to the principal even after the termination of the agent's employment."), *superseded by*

*statute on other grounds*, 31 U.S.C. § 3729(b), *as recognized in United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 118 n.2 (D.D.C. 2003); Restatement (Second) of Agency § 275 cmt. e.

54. In sum, the Court cannot accept Counterclaimants' allegations that IOMAXIS and its members relied, much less reasonably, on a representation that Howard did not approve or sign a document approving the governance changes. According to the Counterclaim, Howard sent the executed ratification document to IOMAXIS's agent; IOMAXIS operated as though the ratification had occurred; and IOMAXIS asserted that Howard signed the ratification document after the filing of the *Complaint*. As such, Counterclaimants' fraud claim fails. *See Sullivan*, 158 N.C. App. at 28; *Bucci*, 2020 NCBC LEXIS 79, at *28.

55. To be clear, the Court's decision does not seek to endorse or disregard misconduct that may have occurred during the discovery process. Parties must comply with their discovery obligations and litigate in good faith. However, it is the Court's belief that Counterclaimants' factual allegations cannot support a fraud claim.[11]

56. Therefore, the Court **GRANTS** the Motion as to Counterclaimants' fraud claim, and that claim is **DISMISSED** with prejudice.[12]

---

[11] The Court also notes that remedies exist to compensate parties for wrongdoing during the discovery process. *See* N.C.G.S. § 1A-1, Rule 37.

[12] The Court has carefully considered Counterclaimants' fraud claim and determined in its discretion that the dismissal should be with prejudice. *See First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013) ("The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]").

**B.** **Specific Performance**

57. Specific performance is a remedy for breach of contract,[13] not an independent cause of action. *See Munchak Corp. v. Caldwell*, 301 N.C. 689, 694 (1981); *Luccia v. Ross*, 274 S.W.3d 140, 146 (Tex. App. 2008). Remedies asserted as standalone claims are subject to dismissal. *See Barings LLC v. Fowler*, 2025 NCBC LEXIS 18, at *22 (N.C. Super. Ct. Feb. 13, 2025) (dismissing "purported standalone claim for permanent injunction"); *Vereen v. Holden*, 121 N.C. App. 779, 785 (1996) ("Since we have dismissed plaintiff's breach of contract claim, we affirm the dismissal of his specific performance 'claim' as it is a remedy for breach of contract.").

58. As such, the Motion is **GRANTED** with respect to the claim for specific performance, and that claim is dismissed with prejudice. However, this dismissal is without prejudice to Counterclaimants' ability to seek specific performance as a remedy should they assert a proper underlying claim.

## VI.    CONCLUSION

59. For the foregoing reasons, the Court hereby **GRANTS** the Motion and dismisses Counterclaimants' claims with prejudice.

**IT IS SO ORDERED**, this the 15th day of July, 2026.

/s/ Michael L. Robinson
Michael L. Robinson
Chief Business Court Judge

---

[13] The Court observes that Counterclaimants have brought a "claim" for specific performance but no corresponding claim for breach of contract. (*See generally* Countercl.)